UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER MICHAEL CHEATHAM,

                Petitioner,                Case No. 2:25-cv-10534

v.                                      Honorable Susan K. DeClercq
                                           United States District Judge

MINDY BRAMAN,

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF No. 1), DENYING CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO APPEAL *IN FORMA PAUPERIS***

In 2021, Petitioner Christopher Michael Cheatham was convicted by a Washtenaw County jury of second-degree murder, MICH. COMP. LAWS § 750.317, receiving and concealing stolen property, MICH. COMP. LAWS § 750.535(5), and stealing a financial transaction device, MICH. COMP. LAWS § 750.157n(1). Cheatham was subsequently sentenced to 18-40 years of imprisonment for the murder conviction and lesser terms for his other convictions.

In February 2025, Cheatham filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. He raises two claims: First, that the expert testimony regarding the victim's time of death was erroneously admitted, and second, that he was denied the effective assistance of counsel. As explained below, Cheatham's petition will be denied because neither claim warrants habeas relief.

# I. BACKGROUND

On the afternoon of February 20, 2019, electronic monitoring of Richard Fortune's pacemaker sent an alert to healthcare providers at University of Michigan Hospital. ECF No. 9-24 at PageID.1164. First responders were sent to his Ann Arbor home where they found his body in his basement. *Id.* An autopsy revealed that Fortune had been strangled to death. *Id.* Following an investigation, Cheatham, one of two tenants at Fortune's house, was charged with first-degree murder and other offenses. *See generally id.*

At Cheatham's jury trial, witnesses testified that Fortune was a physically active 71-year-old retired postal worker. ECF No. 9-17 at PageID.586, 613. Fortune rented out two bedrooms on the upper level of his tri-level house. *Id.* at PageID.583. One room was rented to Cheatham, and the other room was rented to Peresto Burks. ECF No. 9-24 at PageID.1164, 1166. Fortune lived in a bedroom on the lower level. Fortune told a friend on February 17, 2019, that he was planning to evict one of his tenants because he wasn't paying rent. ECF No. 9-17 at PageID.585–86.

Cheatham's girlfriend testified that on February 9, while she was visiting Cheatham at Fortune's home, she heard Fortune complain to Cheatham about unpaid rent. ECF No. 9-19 at PageID.847–48. Fortune gave Cheatham 30 days to move out. *Id.* When she came over again on February 17, Cheatham still had not paid his rent. *Id.* at PageID.848–49.

- 2 -

On the afternoon of February 19, Fortune played pickleball at a nearby recreational center. ECF Nos. 9-17 at PageID.602, 9-18 at PageID.649. But after that, his neighbors and friends never heard from him again. Fortune did not shovel the newly fallen snow or watch the road work in front of his house on the morning of February 20, something one neighbor expected to see. ECF No. 9-18 at PageID.639–41. Nor did Fortune answer a phone call from a friend on the morning of February 20. *Id.* at PageID.635. Finally, Fortune failed to arrive for a scheduled card game at noon on February 20, and he did not show up as expected at the recreational center later that day. *Id.* at PageID.635–37.

Ann Arbor municipal workers happened to be repairing a broken water main immediately in front of Fortune's house on the morning of February 20. *Id.* at PageID.653, 663, 673, 683, 690, 757. Burks' Jeep was parked over the location of the break, and he came out of the house to move it sometime that morning. *Id.* at PageID.653–57, 663, 690. Workers testified that a younger man was also at the house. *Id.* at PageID.654, 657. They talked to him when they knocked on the door to ask for the Jeep to be moved, and they talked to him again later when they asked that people in the home not use the water or sewer. *Id.* at PageID.664–65, 674.

At about 3:00 p.m. on February 20, providers at the device clinic at U of M Hospital received a report from Carelink that Fortune's heart was not responding to his pacemaker. *Id.* at PageID.696–720. The clinic tried to call Fortune, but he did

not answer. *Id.* at PageID.700, 719. When providers obtained and reviewed further data from Carelink, it showed that the device was unable to get a response from Fortune's heart during a test conducted at 1:00 a.m. the previous night. *Id.* at PageID.718. Based on the data they believed that Fortune was dead, and so they called 9-1-1. *Id.* at PageID.700, 718–20.

An EMS worker was the first to arrive at Fortune's home. *Id.* at PageID.722–24. The door was unlocked, so he let himself inside. *Id.* at PageID.724. Fortune's body was found in a basement bedroom under a pile of blankets, wrapped in a tarp, and tied up with a rope. *Id.* at PageID.724–25; 728; 732. Police arrived and found Fortune's cellphones and credit cards in Cheatham's upstairs bedroom. ECF No. 9-19 at PageID.806–07. They also found a pair of gloves in Cheatham's room. *Id.* at PageID.818–19.

A subsequent autopsy revealed significant injuries to Fortune's neck and face. ECF No. 9-21 at PageID.1014, 1017–29. He had a bruised eye, split lip, and blunt force injury to his head. *Id.* at PageID.1019–21. Fractures of the Adam's apple, first rib, and third cervical vertebrae, along with pronounced blood congestion in the head, indicated that Fortune had been strangled to death. *Id.* at PageID.1019–25. Fortune's pacemaker appeared to be correctly connected to his heart. *Id.* at PageID.1022–24.

An engineer from Medtronic explained the function and testing features of Fortune's pacemaker. *See generally id.* at PageID.965–980. A review of Fortune's data showed that prior to February 19, his pacemaker was rarely required to pace his heart. *Id.* at PageID.980–81. The pacemaker also ran different kinds of periodic tests, and it sent the results to Medronic's network from a device located in Fortune's home. *Id.* A test run at 8:24 p.m. on February 19 showed normal functioning of Fortune's heart and pacemaker. *Id.* at PageID.981. Every day at 12:24 a.m. the device conducted an impedance test. Starting at a low value and working upwards, the test would measure the minimum shock necessary to induce a response from Fortune's heart. *Id.* at PageID.972–74. Even at the highest level, the device was unable to get a response from Fortune's heart for the test conducted at 12:24 a.m. on February 20. *Id.* at PageID.982–85. An amplitude test performed at 2:15 a.m. also indicated that Fortune's heart was not beating.[1] *Id.* at PageID.984–86.

Based on this evidence, the prosecutor asserted that Fortune must have been killed at his home sometime between 8:24 p.m. and 12:24 a.m. on the night of

---

[1] Defense counsel challenged the admissibility of the witness's opinion testimony regarding what the testing data showed in a pretrial motion, but after a multi-day hearing the trial court held it was admissible under Michigan Rule of Evidence 702 and *Daubert v. Merrill Dow*, 509 U.S. 579 (1993). ECF Nos. 9-13, 9-14, and 9-15.

February 19–20. Thus, a central issue at trial was the whereabouts of Fortune's two tenants that night.

Cheatham worked at a Tropical Smoothie Cafe near Fortune's house. ECF No. 9-18 at PageID.739–40. On February 19, he worked a shift from 11:00 a.m. to 5:22 p.m. *Id.* at PageID.740; *see also* ECF No. 9-19 at PageID.839. And on February 20, he worked from 11:05 a.m. to around 3:00 p.m. ECF Nos. 9-18 at PageID.746–47; 9-19 at PageID.839.

Cheatham also worked another job with a friend at Scorekeepers Bar in Ann Arbor. ECF No. 9-19 at PageID.777. The friend had previously heard Cheatham complain about disagreements Cheatham and Fortune had about rent and boundaries. *Id.* at PageID.781. On February 19, at around 7:30–8:00 p.m., the friend picked Cheatham up from Fortune's house and drove him to work. *Id.* at PageID.779. About an hour into his shift, Cheatham was fired for the way he was wearing a bandana over his face. *Id.* at PageID.779–80. Cheatham called an Uber to drive him home. *Id.* at PageID.780. The Uber app on Cheatham's phone showed that he was picked up on State Street in Ann Arbor at 10:26 p.m., and he was dropped off at Fortune's house at 10:38 p.m. ECF No. 9-21 at PageID.932.

The other tenant, Burks, worked as a dishwasher at Session Room, another Ann Arbor area restaurant. ECF No. 9-18 at PageID.749–52. He admitted that he got behind on rent a few times, but a program at the VA would help him catch up. *Id.* at

PageID.751. On February 19, Burks went to work around 3:00 p.m., and he saw Fortune sitting in the kitchen when he left. *Id.* at PageID.752. Records indicated that Burks worked until 11:56 p.m. that night. ECF No. 9-19 at PageID.831. When Burks got home, he thought he heard someone in the basement, and he assumed it was Fortune. ECF No. 9-18 at PagEID.765–66. Burks testified that he showered, watched a movie, and then went to bed. *Id.* at PageID.763–64.

The Michigan State Police searched the contents of Cheatham's cellphone. ECF No. 9-20 at PageID.962–63. They discovered Google searches made the morning of February 21, including: "During homicide can police enter your home," "Can police entered a locked room," and "Can you see when he played the PS4 last?" *Id.* at PageID.866–67. Text message exchanges between Cheatham and the friend confirmed that Cheatham was picked up for work around 8:00 on February 19, and that he requested to sleep at the friend's house on the night of February 20. *Id.* at PageID.868–69. The phone's activity application indicated increased activity and climbing stairs at 11:14 p.m. on February 19. *Id.* at PageID.871–72.

Michigan State Police forensic testing matched fibers from the rope used to bind Fortune's body with fibers found on the mismatched gloves seized from Cheatham's bedroom. *See generally* ECF Nos. 9-20 at PageID.882–88; 9-21 at PageID.934–56. Cheatham and Fortune's DNA were also found on the rope, but

Burk's DNA was not found on the rope. *See generally* ECF Nos. 9-20 at PageID.882–88; 9-21 at PageID.934–56.

Based on this evidence, the jury found Cheatham guilty of the lesser charge of second-degree murder and several other offenses. ECF No. 9-22 at PageID.1129–31. Following sentencing, Cheatham filed a direct appeal in the Michigan Court of Appeals. His appellate counsel filed a brief on appeal that raised one claim:

> I. The trial judge failed her role as gatekeeper under *Daubert* and MRE 702 by admitting time-of-death evidence based on a novel technique of interpreting pacemaker data in a way whose error rate was concededly unknown, and where the possibility of error could not be excluded because an available test had not been performed. The error denied Christopher Cheatham his state and federal constitutional right to due process.

Cheatham also filed his own supplemental *pro se* brief that raised three additional claims:

> I. Lack of defense expert witness – ineffective counsel.
>
> II. Sharon Hampton interview – ineffective counsel.
>
> III. Laura Horwood's testimony – ineffective counsel and failure of gatekeeper.

The Michigan Court of Appeals affirmed Cheatham's conviction in an unpublished opinion. *People v. Cheatham*, No. 360345, 2023 WL 4539868 (Mich. Ct. App. Jul. 13, 2023). Cheatham then appealed to the Michigan Supreme Court, raising the same claims, but his application for leave to appeal was denied. *People*

*v. Cheatham*, 997 N.W.2d 190 (Mich. 2023) (Table). Cheatham's federal habeas petition raises the same claims that he raised on direct appeal.

## II. LEGAL STANDARD

28 U.S.C. § 2254(d) limits federal habeas review of state convictions for claims adjudicated on the merits by state courts. A habeas petitioner must demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court law. *Id*. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

Under this standard, a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### III. DISCUSSION

### A. Admission of Expert Testimony

Cheatham's first claim asserts that the trial court erred under Michigan Rule of Evidence 702 and *Daubert* when it permitted admission of opinion testimony from the Medtronic engineer regarding Fortune's time of death. ECF No. 1 at PageID.4, 13. Despite a single passing reference to the "federal constitutional right to due process" in an argument heading, the claim was presented to the Michigan courts solely under state evidentiary rules and *Daubert*. *See* ECF No. 9-24 at PageID.1247–51. The Michigan Court of Appeals found that the trial court did not err in admitting the opinion evidence because the challenged testimony "satisfied the reliability standard set forth in MRE 702 and *Daubert*." *Cheatham*, 2023 WL 4539868, at *4.

To demonstrate entitlement to habeas relief, Cheatham must show that his federal constitutional rights were violated. *See* 28 U.S.C. § 2254(a). Thus, to the extent Cheatham continues to assert that the admission of this testimony violated the Michigan Rules of Evidence or constituted state-law error, he fails to state a cognizable claim. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). And though *Daubert* is a U.S. Supreme Court case, "screening evidence through *Daubert's* standards is not constitutionally required," *Bojaj v. Berghuis*, 702 F. App'x 315, 320 (6th Cir. 2017). A misapplication of the *Daubert* standard therefore "cannot serve as

a basis for granting habeas corpus relief." *Thomas v. Jackson*, No. 17-1813, 2018 WL 3491763, at *3 (6th Cir. Feb. 13, 2018).

Nor may Cheatham attempt for the first time now to federalize his evidentiary claim. Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995). Fair presentation is achieved by presenting the asserted claims in a constitutional context through citation to the Constitution, federal decisions using constitutional analysis, or state decisions which employ constitutional analysis in a similar fact pattern. *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993); *see also Picard*, 404 U.S. at 277-78.

Nothing in the presentation of Cheatham's claim in the state courts satisfies the fair presentation requirement. Cheatham made a passing reference to federal due process in the argument heading, but the entire brief was dedicated to establishing that the trial court erred under Rule 702 and *Daubert*. This presentation of the claim did not satisfy the exhaustion requirement. General or passing appeals to broad constitutional principles such as due process or the right to a fair trial are insufficient

to establish exhaustion. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996); *Duncan*, 513 U.S. at 365-66. Accordingly, Cheatham may not advance an unexhausted due process claim here regarding the admission of the expert testimony.

In sum, Cheatham's first claim is therefore without merit.

### B. Ineffective Assistance of Counsel

Cheatham's second claim raises several allegations of ineffective assistance of trial counsel. ECF No. 1 at PageID.7–9, 15–18. The claim was raised in the state courts in Cheatham's supplemental pro se brief, and the state court rejected the claim on the merits. *Cheatham*, 2023 WL 4539868, at *6-7.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). To show this right was violated under *Strickland*, a defendant must establish that his counsel's performance was deficient and that he was prejudiced by his counsel's deficient performance. *Id.* at 687-88.

When evaluating counsel's performance under *Strickland's* first prong, the reviewing court must apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. *Strickland's* prejudice prong requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

According to the Supreme Court, "[t]he standards created by *Strickland* and § 2254 are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (quoting *Knowles*, 556 U.S. at 113). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Richter*, 562 U.S. at 105. The question on habeas review "is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Cheatham first claims that his trial counsel was ineffective for failing to obtain an expert witness. The state court rejected this claim because Cheatham did not "not identify any specific experts whom he believes should have been consulted or called as a witness, and does not identify the substance of any testimony that could have been provided." *Cheatham*, 2023 WL 4539868, at *6.

This decision reasonably applied the *Strickland* standard. Criminal defendants face an uphill battle in bringing a *Strickland* claim that hinges on a purported failure to call an expert witness. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021). This is because trial counsel's strategic decision regarding whether to hire an expert is entitled to a

"strong presumption of reasonableness." *Id*. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Cheatham failed to present this Court or the state courts with any proffer of evidence regarding his counsel's decision not to call a defense expert. Nor did he proffer any evidence as to how an expert would have testified in his defense. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006). Cheatham's failure to make any offer of proof, standing alone, provided a reasonable and sufficient basis for the state court to reject the claim consistent with *Strickland. See, e.g., Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) ("[The petitioner] has offered no evidence, beyond his assertions, to prove what the content of [the] testimony would have been; a fortiori, he cannot show that he was prejudiced by its omission. . . . And even accepting [the petitioner's] assertion as to [the] testimony, he offers no basis to conclude that, in light of the other evidence presented at trial, it would likely have altered the outcome."); *See also Lagrone v. Parris*, No. 23-5177, 2023 U.S. App. LEXIS 20470, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) (finding that a habeas petitioner failed to prove *Strickland*

- 14 -

prejudice where he failed to identify expert his trial counsel could have called). This

allegation is without merit.

Cheatham next asserts that his trial counsel was ineffective for failing to call

a witness that would have testified to seeing Burks in an altercation with Fortune

and hearing Burks make a statement that he had killed someone. The state court

rejected the allegation as follows:

> Defendant does identify the alleged potential witness, who was interviewed by the police. He states in his brief that he informed his counsel of her existence and, according to defendant, his counsel stated that the witness was not credible and was "a hot mess." In other words, according to defendant himself, his attorney investigated the potential witness and opted, as a matter of trial strategy, not to have her testify. We will not assess this decision with the benefit of hindsight. *Rockey*, 237 Mich App at 76. In any event, the witness's testimony would not have addressed the fact that, if the jury were convinced of the prosecution's theory of the time of death, there would have been an extremely short interval between the time Burks clocked out of work and the time Fortune's pacemaker sent an alert, in which Burks might have traveled home, killed Fortune, and hid his body. Defendant has not demonstrated a reasonable probability that the lack of this witness's testimony was outcome-determinative. *Ackerman*, 257 Mich App at 455.

*Cheatham*, 2023 WL 4539868, at *7.

This decision also reasonably applied the *Strickland* standard. As with the

previous allegation, Cheatham does not provide any evidence that Burks made such

a statement or that the witness would have testified to hearing one. Furthermore, the

state court noted that Cheatham admitted that his counsel made a deliberate strategic

decision not to question the witness on the topic because counsel believed she was

- 15 -

not credible. It was reasonable for the state court to find that Cheatham's unsupported allegation did not overcome the presumption that counsel's actions were the product of reasonable trial strategy. *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Finally, Cheatham claims that his counsel was ineffective for failing to object to the admission of testimony that was based on a report not provided to the defense. Specifically, he claims that one of the U of M Hospital witnesses was permitted to testify from a report regarding the alert from Fortune's pacemaker that was not provided to defense counsel.

This claim is without merit because defense counsel did, in fact, object to the testimony on this basis. *See* ECF No. 9-18 at PageID.718–19. The trial court ruled on the objection at a sidebar, and the prosecutor was allowed to continue questioning the witness about how she called for the welfare check based on her belief that Fortune had died. *Id.* at 719.

Even assuming some stronger objection to the admission of the testimony should have been made, Cheatham cannot show prejudice. This testimony was at worst cumulative to the expert witness from Carelink who gave more detailed opinion testimony regarding Fortune's time of death that sought to explain the specific data received from his pacemaker. The hospital witness's testimony on the

other hand was more conclusory and appeared to be offered primarily to show why emergency responders were sent to Fortune's home.

Finally, apart from the pacemaker evidence, there was overwhelming other circumstantial evidence offered to prove Cheatham's guilt. Fortune's cellphones and credit cards were found in Cheatham's room. Cheatham's DNA was found on the rope used to bind Fortune's body. Fiber analysis showed that the gloves found in Cheatham's room were used to tie Fortune. Cheatham made incriminating internet searches on his phone following the murder. Based on this unrelated evidence of Cheatham's guilt, it was not unreasonable for the state court to find that Cheatham failed to demonstrate that he was prejudiced by his counsel's failure to press the objection further.

At bottom, because none of Cheatham's claims merit relief, his petition for writ of habeas corpus, ECF No. 1, will be denied.

## IV. CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Before appealing this decision, Cheatham must obtain a certificate of appealability. This Court will decline to issue a certificate of appealability because jurists of reason would not debate whether Cheatham's claims deserve encouragement to proceed further. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Similarly, this Court will deny Cheatham permission to appeal

*in forma pauperis* because an appeal of this decision cannot be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. CONCLUSION

Accordingly, it is **ORDERED** that Cheatham's Petition for a Writ of Habeas Corpus, ECF No. 1, is **DENIED WITH PREJUDICE**.

Further, it is **ORDERED** that a Certificate of Appealability is **DENIED**.

Further, it is **ORDERED** Cheatham is **DENIED LEAVE** to proceed *in forma pauperis* on appeal.

**This is a final order and closes the above-captioned case.**

/s/Susan K. DeClercq
SUSAN K. DeCLERCQ
United States District Judge

Dated: July 24, 2026